# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| **vs.** | § | **1:18-cr-00250** |
| | § | |
| LUIS EDUARDO MARTINEZ, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S SUPPLEMENTAL (SECOND) SENTENCING MEMO

COMES NOW Defendant, **LUIS EDUARDO MARTINEZ**, by and through his CJA Attorney, Buzz Jordan, and submits Defendant's Supplemental (Second) Sentencing Memo for the Court as follows:

A. On June 3, 2020, Defendant and counsel appeared at a sentencing hearing and the Court directed Defendant's counsel to submit a brief by June 17, 2020 regarding whether Defendant should be sentenced to 30 years or life (i.e. life without parole) in this case, and Defendant's sentencing hearing was reset to June 22, 2020.

B. Defendant's PSI Report set out Defendant's guideline range as follows:
   1. Base offense level of 38
   2. Addition for "leader" +2 (Defendant objected to this 2-point leader enhancement, the Court denied Defendant's objection)
      Adjusted level of 40
      Acceptance of responsibility -3
   3. Criminal History II
      (Defendant had 2003 conviction and sentenced to 135 months)
   4. Final adjustment = 37/level II

   5. Defendant's guideline range – 37/level II:
      a. 240 to 293 months (20 years to 24 ½ years)

   6. Defendant's statutory range:
      a. Because of Defendant's prior conviction, Defendant's minimum mandatory sentence was enhanced from 10 years to 20 years;
      b. Because of the 1st Step Act – Defendant's minimum mandatory sentence was reduced to 15 years (vs. 20 years)

C. Defendant's counsel had asked the Court at Defendant's sentencing hearing on June 3, 2020, to sentence Defendant to the minimum mandatory sentence of 15 years based upon 18 USC §3553(a)'s sentencing consideration factors.

D. Benefit of Federal Sentencing Application and Procedure:
   1. Defendant immediately accepted responsibility in this case;
   2. Defendant saved the US from the expense and preparation of a jury trial;
   3. Defendant's counsel submits that Defendant's immediate action regarding his guilty plea induced the three other Co-Defendants to plead guilty too.
   4. Defendant's counsel had hoped Defendant would receive the benefit of a 3-point guideline reduction by immediately accepting responsibility and his guilty plea;
   5. Defendant entered into a Plea Agreement with the US. The US agreed to recommend the low end of the sentencing guidelines, i.e. 240 months.
   6. At sentencing, the US stated it was bound by the PA to recommend the low end of the guidelines but stated to the Court that "240 months" in this case was "generous".
   7. Defendant submits that the "generous" statement is outside the spirit of the plea agreement and violates the plea agreement and Defendant is filing a motion to set aside the PA and will ask for a jury trial.

E. Chilling Affect
   In response to the Court's directive to brief and/or argue for a 30 year or life sentence (i.e. life without parole), Defendant's counsel submits that either sentence is "greater than necessary," is draconian and the purpose of sentencing will not be satisfied by either sentence. In addition, either sentence will have a chilling effect on any future pleas because a Defendant will no longer have an incentive under federal practice to accept responsibility, make a proffer, or plead guilty because a Defendant will not receive any benefit by following standard federal sentencing procedures and/or practices in this district.

F. Defendant's Enhanced Sentencing
   a. Defendant's sentence is already enhanced because of his prior 2003 conviction for which he was already punished and sentenced to 135 months and was deported from the US.
   b. Defendant also received a criminal history of II in this case based solely upon his prior conviction which included his minimum mandatory sentence being enhanced to 15 years and his guidelines increased from 210-262 months to 235-293 months.
   c. In addition, at Defendant's sentencing hearing on June 3, 2020, the Court stated that Defendant had probably committed other acts of transporting drugs since his release from federal prison and/or deportation from the US in 2013. The PSI

report, however, did not provide any other acts of transporting drugs by Defendant from 2013 to date, except this case.

    d. Importantly, Defendant was not the captain that piloted the vessel into US international territory in this case and Defendant never stepped on US soil. Defendant was on a vessel captained by Jackson Alexander Vera Cubeza, a Co-Defendant, who piloted the route of the vessel into international waters, i.e. US jurisdiction. The vessel was, in fact, bound for Mexico and not for the US.

G. <u>Kingpin</u>

    a. Defendant was not a Kingpin, was not the "organizer" and was not the "money man" regarding this vessel's operation.

    b. Comparing Defendant to Manuel Noriega (the former President of Panama), Noriega was sentenced by the US to a 30-year prison sentence (See Defendant's Exhibit #1 attached hereto). Defendant should not be sentenced as harshly as Noriega. Sentencing Defendant to a sentence comparable to Noriega is disproportionate for this 6th grade educated, street raised, broke, Guatemalan mule.

    c. Patrick Dewayne Hall, age 37, a cocaine/heroin kingpin named in a 72-count indictment with 23 others in Birmingham, AL was sentenced to 22 years and 11 months on June 28, 2016. He was the leader of Birmingham's largest cocaine and heroin trafficking ring. (See Defendant's exhibit #2 attached hereto).

    d. On April 13, 1983, the Baldwin County District Attorney (who had served as District Attorney from 1958 until his conviction in Federal Court for drug conspiracy charges, i.e. 25 years) was sentenced to 5 years in federal prison. (See Defendant's Exhibit #3 attached hereto).

H. <u>Co-Defendants – Disparity in Sentencing</u>

Defendant's Co-Defendants were sentenced as follows:

1. Jackson Alexander Vera Cubeza (the captain of the vessel) = 120 months
2. Caesar Xavier Garcia Vera (mechanic) = 120 months
3. William Tolaza Cuero (mechanic) = 120 months
4. See also Defendant's Exhibit #5 with miscellaneous sentencing charts for comparable sentences.

I. <u>5k.1 Proffer</u>

    a. Defendant met with US law enforcement on several occasions to provide the US information pursuant to a proffer agreement.

    b. As the homeland security agent testified at the June 3, 2020 sentencing hearing, the US was able to corroborate some of Defendant's information.

  c. Defendant's counsel notes that the US used some of Defendant's proffered evidence to claim he was a "leader" (i.e. 2-point enhancement). The proffer is not supposed to be used to enhance a sentence.

  d. Finally, at this date, it is not readily possible, and the US has not been able to arrest anyone "up the chain of the organization" in Mexico or Columbia.

  e. Defendant, however, made a genuine attempt to assist the US in this case and Defendant put his and his family's lives in danger in Mexico and/or Guatemala because of his efforts.

J. <u>No Violence or Guns Involved In the Seizure of Vessel or in Defendant's Criminal History</u>

Another mitigating fact is that there was no violence or guns involved at Defendant's arrest on the vessel. Defendant has never shot or assaulted anyone, Defendant has never robbed anyone, Defendant has not raped anyone, Defendant has never murdered anyone, wherein all such offenses would warrant a 30 year or LWOP sentence.

K. <u>18§3553 (a) Sentencing/Mitigation Factors:</u>

1. Defendant's age 54;
2. Defendant's life expectancy, 81;
3. Defendant's life expectancy in federal prison with COVID-19, unknown (See Defendant's Exhibit #4 attached hereto)
4. Defendant at age 69 (15-year sentence), at age 74 (20 year sentence), makes recidivism substantially unlikely;
5. Sentences of other similarity situated Defendant's convicted of 46 USC §70506(b);
6. 6th grade education;
7. Mule – not the organizer, not the money man, not the kingpin;
8. Defendant lived on streets of Guatemala since age 13 without adult guidance after his grandparents died. The Court may consider the Defendant's individual cultural heritage and the difficulty of life on the streets of a third world country and lack of educational background;
9. Defendant is a deportable alien who will face more severe restrictions in prison than a non-alien;
10. Defendant will be deported immediately upon serving his time if he doesn't die in prison before his release.

L. <u>Conclusion:</u>

<u>President Abraham Lincoln</u>

President Abraham Lincoln stated, "I have always found that mercy bears richer fruits than strict justice".

Counsel again asks the Court for mercy and compassion under the totality of circumstances of this individual Defendant, LUIS EDUARDO MARTINEZ, and to sentence Defendant to 15 years after which he will be deported from the US at age 69 (if he doesn't die first) instead of dying alone, with no family, in a US prison.

Respectfully Submitted,

/s/ Buzz Jordan
Buzz Jordan
Attorney for Defendant

OF COUNSEL:
BUZZ JORDAN, P.C.
1111 Dauphin Street
Mobile, AL 36604
buzz@rossandjordan.com

## CERTIFICATE OF SERVICE

I certify that on June 17, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

AUSA George May
United States Attorney's Office
63 So. Royal Street, Suite 600
Mobile, Alabama 36602

USPO Melissa Rankin
201 St Michael St # 2,
Mobile, AL 36602

/s/ Buzz Jordan
Buzz Jordan

# SUPREME COURT OF THE UNITED STATES

## MANUEL ANTONIO NORIEGA *v.* GEORGE PASTRANA, WARDEN

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 09–35.   Decided January 25, 2010

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting from denial of certiorari.

"[I]n our tripartite system of government," it is the duty of this Court to "say 'what the law is.'" *Boumediene* v. *Bush*, 553 U. S. ____ (2008) (slip op., at 36) (quoting *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803)). This duty is particularly compelling in cases that present an opportunity to decide the constitutionality or enforceability of federal statutes in a manner "insulated from the pressures of the moment," and in time to guide courts and the political branches in resolving difficult questions concerning the proper "exercise of governmental power." *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 637 (2006) (KENNEDY, J., concurring in part); see generally *Sanchez-Llamas* v. *Oregon*, 548 U. S. 331, 353–354 (2006); *Hamdan*, *supra*, at 588 (quoting *Ex parte Quirin*, 317 U. S. 1, 19 (1942)). This is such a case.

The questions presented are, in the Solicitor General's words: "1. Whether Section 5 of the Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2631, precludes petitioner from invoking the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, as a source of rights in a habeas corpus proceeding"; and "2. Whether, assuming petitioner can assert a claim based on the Geneva Convention, his extradition to France would violate the Convention." Brief in Opposition i (some



citations omitted).[1]  Answering just the first of these ques-
tions would provide much-needed guidance on two impor-
tant issues with which the political branches and federal
courts have struggled since we decided *Boumediene*.  The
first is the extent, if any, to which provisions like Section 5
affect 28 U. S. C. §2241 in a manner that implicates the
constitutional guarantee of habeas corpus.  The second is
whether the Geneva Conventions are self-executing and
judicially enforceable.

It is incumbent upon us to provide what guidance we
can on these issues now.  Whatever conclusion we reach,
our opinion will help the political branches and the courts
discharge their responsibilities over detainee cases, and
will spare detainees and the Government years of unnec-
essary litigation.  These considerations alone justify re-
view.  That petitioner was convicted in federal court
(rather than in a military commission) in criminal pro-
ceedings uncomplicated by classified information or issues
relating to extraterritorial detention is an additional
reason to grant certiorari.  It is our duty to say what the
law is on important matters within our jurisdiction.  That
is what we should do.

                              I

Petitioner General Manuel Noriega is the former head of
the Panamanian Defense Forces.  In 1988, a federal grand
jury indicted Noriega, and the U. S. military thereafter
brought him to Florida.  A federal jury convicted him of
various federal narcotics-related offenses, and the District
Court sentenced him to a 30-year prison term.  In re-
sponse to Noriega's concerns about the type of care he

---

[1] We routinely grant certiorari on questions the Solicitor General
presents in a brief in opposition, see, *e.g.*, *Weyhrauch* v. *United States*,
557 U. S. __ (2009), or in an *amicus* brief, see, *e.g.*, *Hamilton* v.
*Lanning*, *ante*, p. ___; *Republic of Philippines* v. *Pimental*, 552 U. S
1061 (2007).

would receive in the custody of the Bureau of Prisons, the District Court designated Noriega a prisoner of war (POW) entitled to the protections of the Geneva Conventions. See *United States* v. *Noriega*, 808 F. Supp. 791 (SD Fla., 1992).[2] Noriega's conviction and sentence were affirmed in proceedings not relevant here. See *United States* v. *Noriega*, 117 F. 3d 1206 (CA11 1997), cert. denied, 523 U. S. 1060 (1998).

In July 2007, two months before Noriega was scheduled to be released on parole, he filed a habeas corpus petition under 28 U. S. C. §2255. Relying on the District Court's POW designation, Noriega alleged that the United States violated the Geneva Conventions when it acquiesced in the French Government's request to extradite him to France so he could face criminal charges there upon his release from U. S. custody. See *United States* v. *Noriega*, No. 88–0079–CR, 2007 WL 2947572 (SD Fla., Aug. 24, 2007). The District Court agreed with Noriega that his

---

[2] Citing International Red Cross and academic commentary in support of its "belie[f] [that the Third] Geneva [Convention] is self-executing and provides General Noriega with a right of action in a U. S. court for violation of its provisions," the District Court addressed Noriega's status under the treaty. *United States* v. *Noriega*, 808 F. Supp., at 794. The District Judge found that the hostilities in Panama constituted an "'armed conflict'" within the meaning of Article 2 of the Third Geneva Convention, that Noriega was a member of the armed forces of a party to the conflict under Article 4 of the Third Convention, and that the District Court was a "'competent tribunal'" to determine Noriega's POW status under Article 5 of the Third Convention. See *id.*, at 793–796. Accordingly, the court concluded that, notwithstanding various separation-of-powers and justiciability concerns, "Noriega is in fact a prisoner of war as defined by Geneva III, and as such must be afforded the protections established by the treaty" while in federal custody. *Id.*, at 796. The court then identified Convention rights that it believed would govern Noriega's confinement, see *id.*, at 799–803, and observed that "[w]hether or not those rights can be fully provided in a maximum security penitentiary setting is open to serious question," *id.*, at 803.

THOMAS, J., dissenting

POW status entitled him to the Conventions' protection until his "final release and repatriation," but dismissed his §2255 petition on the ground that his extradition challenge was not directed to "any defect in [his] sentence," and thus was not cognizable under §2255. *Id.*, at *1 (internal quotation marks and citation omitted). Noriega then filed the same claims under 28 U. S. C. §2241, and the District Court ultimately[3] stayed his extradition pending appeal on the ground that his challenge rested on "credible arguments . . ., particularly with regard to the interpretation of certain provisions of the Geneva Convention[s]," on which "no other federal court has ruled." No. 07–CV–22816–PCH, 2008 WL 331394, *3 (SD Fla., Jan. 31, 2008).

On appeal, Noriega argued that his extradition to France would violate several provisions of the Third Convention and that the District Court erred in concluding otherwise. In response, the Government asserted that the court lacked jurisdiction over Noriega's claims because §5(a) of the Military Commissions Act of 2006 (MCA) establishes that "[t]he Geneva Conventions are not self-executing" or judicially enforceable in habeas corpus actions. Brief for United States in No. 08–11021–F (CA11), p. 13 (hereinafter Brief for United States).[4] MCA §5(a) provides:

---

[3] The District Court dismissed Noriega's initial §2241 petition because the court concluded that it lacked jurisdiction to consider the petition's extradition challenge in Noriega's criminal case as opposed to a separate action challenging his certificate of extraditability. See *United States* v. *Noriega*, No. 88–0079–CR, 2007 WL 2947981, *1 (SD Fla., Sept. 7, 2007) (dismissing the petition without prejudice but reiterating the merits concerns with Noriega's Geneva Convention claims that the court articulated in dicta in dismissing his §2255 petition).

[4] The Government also challenged Noriega's claims as meritless and outside the scope of habeas review under Circuit precedent.

"No person may invoke the Geneva Conventions or
any protocols thereto in any habeas corpus or other
civil action or proceeding to which the United States,
or a current or former officer, employee, member of
the Armed Forces, or other agent of the United States
is a party as a source of rights in any court of the
United States or its States or territories.    120 Stat.
2631, note following 28 U. S. C. §2241."[5]

Emphasizing that a non-self-executing treaty "'addresses
itself to the political, not the judicial department,'" the
Government observed that "no court of appeals has held
that the provisions of the Geneva Conventions are judi-
cially enforceable in any context."    Brief for United States
13 (quoting *Medellín* v. *Texas*, 552 U. S. 491, 516 (2008)).
The Government then argued that "confirmation of this
[view] can be found in the enactment of [MCA §5(a)],
which "codifie[d] the principle that the Geneva Conven-
tions [a]re not judicially enforceable by private parties,"
but did so in a narrow way that does not purport to strip
courts of habeas jurisdiction, and thus does "not implicate"
the Suspension Clause analysis in *Boumediene*.    Brief for
United States 14, n. 6.[6]

---

[5] Recent amendments to the Military Commissions Act of 2006, collec-
tively titled the Military Commissions Act of 2009, see National De-
fense Authorization Act for Fiscal Year 2010, see §§1801–1807, 123
Stat. 2574–2614, do not affect MCA §5(a).    The 2009 amendments
principally update provisions relevant to the Guantanamo habeas
corpus cases pending in the U.S. District Court for the District of
Columbia and clarify the due process protections available in those and
other noncitizen detainee cases to which the constitutional and treaty
issues in this case relate.  See *ibid.*; see also J. Elsea, CRS Report for
Congress, Comparison of Rights in Military Commission Trials and
Trials in Federal Criminal Court, 2–4 (Nov. 19, 2009).

[6] Although the Government distinguishes MCA §5(a) from the juris-
diction-stripping provision the Court invalidated in *Boumediene*, it
stops short of asserting that §5(a) is constitutional.  See Brief in Oppo-
sition 8, n.

The Eleventh Circuit accepted the District Court's designation of Noriega as a POW, but agreed with the Government's interpretation of MCA §5(a):

> "We affirm and hold that §5 of the Military Commissions Act of 2006 precludes Noriega from invoking the Geneva Convention as a source of rights in a habeas proceeding and therefore deny Noriega's habeas petition.
>
> .     .     .     .     .
>
> "The issues present in *Boumediene* v. *Bush* concerning the constitutionality of §7 of the MCA, are not presented by §5 . . . . In *Boumediene,* the Supreme Court found §7 of the MCA, which explicitly removed the jurisdiction of courts to consider habeas actions by enemy combatants, to be unconstitutional . . . . Section 5, in contrast, as discussed more fully, *infra,* at most changes one substantive provision of law upon which a party might rely in seeking habeas relief. We are [thus] not presented with a situation in which potential petitioners are effectively banned from seeking habeas relief because any constitutional rights or claims are made unavailable.   564 F. 3d 1290, 1292, 1294 (CA11 2009) (citations and parenthetical omitted)."[7]

Noriega's petition challenges both the Eleventh Circuit's interpretation of MCA §5(a) and the provision's constitutionality. Noriega begins by asserting that the Court of Appeals erred in holding "that [MCA §5(a)] absolutely and unambiguously prohibits persons from raising any claim based upon the four Geneva Conventions" in a habeas

---

[7]The Court of Appeals also concluded that, "assuming *arguendo*" Noriega is correct that "§5 of the MCA does not preclude [his] claim," *Noriega,* 564 F. 3d, at 1297, the Third Geneva Convention does not bar his extradition to France and the "United States has fully complied with" the treaty, *id.,* at 1298.

corpus action. Pet. for Cert. 10; see also *id.*, at 12 ("At best, the statutory scheme is ambiguous"). Noriega next asserts that, if the Eleventh Circuit's interpretation of §5(a) is correct, the provision violates the Supremacy Clause, see *id.*, at 11–12, and the Suspension Clause, see Reply to Brief in Opposition 2. Noriega's Supremacy Clause argument is that, to the extent MCA §5(a) governs his Geneva Convention claims, the provision impermissibly effects a "complete repudiation" of the treaty. Pet. for Cert. 11. The Government responds that this argument suffers from two fatal flaws. First, this Court has held that a treaty, which is "'primarily a compact between independent nations,'" remains in force as the supreme law of the land even where its enforcement is left to "international negotiations" rather than "domestic courts." Brief in Opposition 7 (quoting *Head Money Cases*, 112 U. S. 580, 598 (1884)); see *Medellín, supra,* at 505, and n. 3. Second, "[w]hatever the domestic effect of the Third Geneva Convention before the enactment of the MCA," this Court has held that 'it is within Congress' power to change domestic law, even if the law originally arose from a self-executing treaty.'" Brief in Opposition 7 (quoting *Noriega, supra,* at 1295–1296); see also *Medellín, supra,* at 509, n. 5. Accordingly, the Government agrees with the Eleventh Circuit that MCA §5(a) "does not change the international obligations of the United States under the Geneva Conventions," but does "supersed[e] whatever domestic effect the Geneva Conventions may have had in actions such as this." Brief in Opposition 7–8 (internal quotation marks and citation omitted). That brings Noriega to his Suspension Clause argument. He replies that, if MCA §5(a) operates in the manner the Government describes and the Eleventh Circuit held, the provision is unconstitutional under *Boumediene* because it "effectively works a suspension of the writ." Reply to Brief in Opposition 2 (asserting that "to divorce the writ from

the law is to destroy the writ").

## II

As the Eleventh Circuit's opinion makes clear, the threshold question in this case is whether MCA §5(a) is valid. Answering that question this Term would provide courts and the political branches with much needed guidance on issues we left open in *Boumediene*. See *Boumediene*, 553 U. S, at ___, ____ (slip op. at 64–66, 68–70). Providing that guidance in this case would allow us to say what the law is without the unnecessary delay and other complications that could burden a decision on these questions in Guantanamo or other detainee litigation arising out of the conflict with Al Qaeda.

*Boumediene* invalidated MCA §7's attempt to strip federal courts of habeas jurisdiction over claims by a specified class of non-citizen detainees ("unlawful enemy combatants"), but did not determine the "content of the law that governs petitioners' detention," *id.*, at ___ (slip op. at 69), or the extent to which §2241's substantive provisions affect the constitutional "procedural protections of habeas corpus," *id.*, at ___ (slip op. at 70). Section 2241 broadly confers jurisdiction over a habeas corpus action by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States." See *Rasul* v. *Bush*, 542 U. S. 466, 473 (2004). MCA §5(a) eliminates the Geneva Conventions as a source of rights upon which §2241 petitioners may rely in challenging their detentions. Statutory amendments to an existing law ordinarily involve nothing more than a valid exercise of Congress' Article I authority. See, *e.g., Chew Heong* v. *United States*, 112 U. S. 536, 562–563 (1884). Noriega asserts that the difference in this case is that the statutory amendment narrows the scope of §2241. Assuming that is correct, the indeterminate interplay between the constitutional and statutory guarantees of habeas

corpus under our precedents permits Noriega to argue that the manner in which MCA §5(a) affects §2241 proceedings implicates the Suspension Clause. Only we can determine whether the Eleventh Circuit correctly rejected that argument.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, §9, cl. 2. Because the Clause addresses only the suspension—not the content or existence—of the "Privilege of the Writ," *ibid.*, we have long recognized the "obligation" the first Congress "must have felt" to "provid[e] efficient means by which this great constitutional privilege should receive life and activity." *Ex parte Bollman*, 4 Cranch 75, 95 (1807). But we have also steadfastly declined to adopt a date of reference by which the writ's constitutional content, if any, is to be judged, see *Boumediene, supra,* ___ (slip op. at 15–17), and thus have left open the question whether statutory efforts to limit §2241 implicate the Suspension Clause, see, *e.g., INS* v. *St. Cyr*, 533 U. S. 289, 300–301 (2001). This question, which has already divided the Court in other contexts, *see ibid.,*[8] is clearly presented here. Noriega asserts

_____

[8] Compare *St. Cyr*, 533 U. S., at 300–301 (2001) (declining to identify a specific date of reference for judging the constitutional scope of the writ, but concluding that the Court nonetheless should construe the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) to allow §2241 jurisdiction over certain habeas petitions because doing so would avoid the Suspension Clause question that otherwise would arise), with *id.,* at 335–341 (SCALIA, J., dissenting) (emphasizing that, although IIRIRA displaces §2241 jurisdiction unambiguously and thus renders the canon of constitutional avoidance inapplicable, there is no constitutional question to avoid, because the Suspension Clause is addressed only to suspension (*i.e.,* temporary withholding of the operation) of the writ on the terms authorized by the habeas corpus statute, not to Congress' power to alter the substance of the habeas rights the statute confers) and *id.,* at 340–341, n. 5 ("If, as

that MCA §5(a) is unconstitutional because it "effectively
works a suspension of the writ" by imposing the same type
of statutory limitation the Court addressed in *St. Cyr.*
Reply to Brief in Opposition 2 (implicitly equating the
constitutional scope of the writ with §2241's grant of
habeas corpus jurisdiction over individuals allegedly "held
in violation of the Constitution, laws, or treaties of the
United States"). The Eleventh Circuit, however, saw no
constitutional problem with the statute and upheld it as
valid and distinguishable from the provision deemed
unconstitutional in *Boumediene.* See 564 F. 3d, at 1294.

Addressing Noriega's challenge to the Eleventh Circuit's
decision would resolve the important statutory and consti-
tutional questions here and would guide courts and the
political branches in addressing the same and similar
issues in other detainee cases. See, e.g., *Al-Bihani, supra,*
at *5 ("The Supreme Court has provided scant guidance on
these questions, consciously leaving the contours of the
substantive and procedural law of detention open for lower
courts to shape in a common law fashion."). Recent court
decisions, as well as recent Executive Branch court filings
and policy determinations, specifically invoke the Geneva
Conventions as part of the law that governs detainee
treatment in the United States and abroad. For example,
in September 2009, the U.S. District Court for the District
of Columbia issued a redacted version of a classified
memorandum opinion in which it granted habeas corpus
relief in the oldest of the pending Guantanamo cases
because the petitioner's indefinite detention was based
"almost exclusively" on unreliable "confessions" obtained
"using abusive techniques that violated the Army Field

---

the Court concedes, the writ could not be suspended within the mean-
ing of the Suspension Clause until Congress affirmatively provided for
habeas by statute, then surely Congress may subsequently alter what it
had initially provided for, lest the Clause become a one-way ratchet."
(internal quotation marks and citations omitted)).

Manual and the 1949 Geneva Convention Relative to the Treatment of Prisoners of War." *Al Rabiah* v. *United States,* Civ. Action No. 02–828, Unclassified Mem. Op. (DC Sept. 17, 2009), pp. 1–2, 43.

Several recent D. C. Circuit decisions, one of which is now pending before us, similarly implicate the importance of the Geneva Convention and MCA §5(a) questions in this case. In *Kiyemba* v. *Obama,* 555 F. 3d 1022 (2009) *(Kiyemba I)*, cert. granted, *ante,* p. \_\_\_, the petitioners, Guantanamo detainees who prevailed on their habeas corpus claims in federal court but cannot return to their home country, rely on the Geneva Conventions in claiming a right to be released in the territorial United States, see Pet. for Cert. in No. 08–1234, pp. i, 34. Although the D. C. Circuit did not address MCA §5(a) in rejecting this claim, the Government contends before this Court that MCA §5(a) bars petitioners' reliance on the Conventions, see Brief in Opposition in No. 08-1234, pp. 23–24, and Judge Rogers' opinion concurring in the D. C. Circuit's judgment relies upon the same repatriation language in Article 118 of the Third Convention that Noriega raises here, see 555 F. 3d, at 1033, n. 2. In *Al-Bihani, supra,* the D. C. Circuit directly invokes MCA §5(a) in rejecting a Guantanamo detainee's claim that he was entitled to habeas corpus relief because his detention violated, *inter alia,* the Third Geneva Convention, see *id.,* at *2–3; *6 (stating that MCA §5(a), "a provision not altered by the MCA of 2009, explicitly precludes detainees from claiming the Geneva Conventions—which include criteria to determine who is entitled to P.O.W. status—as a source of rights"). Finally, the D. C. Circuit's decision in *Kiyemba* v. *Obama,* 561 F. 3d 509 (2009) *(Kiyemba II)*, implicates the issues here in holding, contrary to several recent district court decisions,[9] that another MCA provision (MCA §7(a)(2), codified

---

[9] See *Khadr* v. *Bush,* 587 F. Supp. 2d 225, 235 (DC 2008) (Bates, J.);

at 28 U. S. C. §2241(e)(2)), does not deprive federal habeas corpus courts of jurisdiction to consider claims in which certain classes of detainees challenge their conditions of confinement under the Geneva Conventions.    See 561 F. 3d, at 512–513.

The extent to which noncitizen detainees may rely on the Geneva Conventions as a source of rights against the United States has also been the subject of increasing debate in the political branches.  Recent Executive Branch Orders and court filings cite the Conventions in articulating the legal standards that govern detainee treatment. See, *e.g.*, Exec. Order No. 13491, §3, 74 Fed. Reg. 4894 (2009) (making "Common Article 3 standards" the "minimum baseline" for the treatment of any individual who, in the course of "any armed conflict," comes into the "custody or under the effective control of an officer, employee, or other agent of the United States" or is "detained within a facility owned, operated, or controlled by a department or agency of the United States"); Brief for United States in Misc. No. 08–442 (TFH), p. 1 (Mar. 13, 2009) (apprising the court of the Government's decision to treat detainees formerly designated as "unlawful enemy combatants" under new standards that draw on the "laws of war," as those laws have "developed over time and have periodically been codified in treaties such as the Geneva Conventions").[10]  Congress, in turn, is considering new legislation

———————

*In re Guantanamo Bay Detainee Litigation*, 577 F. Supp. 2d 312, 314 (DC 2008) (Hogan, J.); *In re Guantanamo Bay Detainee Litigation*, 570 F. Supp. 2d 13, 18 (DC 2008) (Urbina, J.).

[10] This standard presumably will control the Government's position in habeas corpus actions that arise in other circuits pursuant to the President's recent decision to prosecute or imprison (or both) certain Guantanamo detainees in New York and Illinois.  See Hearings Before the Senate Committee on the Judiciary, Testimony of Attorney General Eric Holder pp. 8–9 (Nov. 18, 2009); Federal News Service, Remarks by Former Attorney General Michael Mukasey (Nov. 13, 2009); Presidential Memorandum, Closure of Detention Facilities at the Guantanamo

THOMAS, J., dissenting

that would further clarify the extent to which detainees can enforce Geneva Convention obligations against the United States in federal courts, but progress on these proposals has been complicated by uncertainty over the statutory and constitutional questions in this case.[11]

As noted, addressing these questions now,[12] if only the statutory issues, would avoid years of litigation and uncertainty no matter what we conclude on the merits. A decision upholding MCA §5(a) would obviate the need for detainees, the Government, and federal courts to struggle

---

Bay Naval Base (Dec. 15, 2009); Some Guantanamo Detainees to Move to Illinois Prison, Am. Forces Press Serv. (Dec. 15, 2009); Letter to Pat Quirin, Governor of Illinois, from the Attorney General, the Secretaries of State, Defense, and Homeland Security, and the Director of National Intelligence, at 2 (Dec. 15, 2009) (all sources available in Clerk of Court's case file).

[11] See, *e.g.,* J. Elsea, K. Thomas, & M. Garcia, CRS Report for Congress, Enemy Combatant Detainees: Habeas Corpus Challenges in Federal Court, 36, 41–43 (2009).

[12] Because the D. C. Circuit's majority opinion in *Kiyemba I* does not address MCA §5(a), the provision's validity is not squarely presented in that case. See *Kiyemba* v. *Obama,* 555 F. 3d 1022 (CADC 2009) *(Kiyemba I),* cert. granted, *ante,* p. ___ (2009). And granting review of the D. C. Circuit's decision in *Al-Bihani,* which does address MCA §5(a), would not guarantee a decision on the statute's validity. See *Al-Bihani* v. *Obama,* No. 09–5051, 2010 WL 10411 (CADC 2010). *Al-Bihani* addresses MCA §5(a) in rejecting only one of many claims for habeas corpus relief, so it is not clear that the Court would need to address the statute's validity in deciding the case. And even if the Court were to address §5(a), the decision would come next Term, thus providing no guidance to courts that must adjudicate pending habeas corpus actions this spring and summer. In contrast, addressing MCA §5(a)'s validity in this case would timely provide such guidance. Doing so could also aid our disposition of *Kiyemba I* because answering the questions presented here could clarify the constitutional scope of the writ of habeas corpus in a manner that could affect the *Kiyemba I* petitioners' argument about the inherent remedial power of habeas corpus courts. See Pet. for Cert. in No. 08–1234, pp. 14–16, 22–23; see generally *Kiyemba I,* 555 F. 3d, at 1026–1027; *St. Cyr,* 533 U. S., at 335–340 (SCALIA, J., dissenting).

(as they did here) with Geneva Convention claims in habeas corpus proceedings.[13] And, it would give the political branches a clearer sense of the constitutional limits to which new legislative or policy initiatives must adhere. The latter benefit would also follow if we were to invalidate MCA §5(a). In addition, such a ruling could well allow us to reach the question we left open in *Hamdan*— whether the Geneva Conventions are self-executing and judicially enforceable—because this case is not governed by the Uniform Code of Military Justice provisions on which the *Hamdan* majority relied in holding Common Article III applicable to the proceedings in that case. See *Hamdan*, 548 U. S., at 627–628; see also *id.*, at 637, 642–643 (KENNEDY, J., concurring in part). Finally, if the Court were to conclude that the Conventions are self-executing and judicially enforceable in habeas corpus proceedings, this case would present two additional questions relevant to noncitizen detainee litigation: whether federal courts may classify such detainees as POWs under the Third Convention, and whether any of the Conventions requires the United States immediately to repatriate detainees entitled to release from U. S. custody.[14]

Against these considerations, the Government provides no compelling reason to decline review.[15]  Accord-

---

[13] MCA §5(a) applies not only to individuals who, like Noriega, have (rightly or not) been designated POWs, but also to "any person" who invokes the Conventions as a source of rights in any "habeas or other civil action" to which the United States is a party, see 120 Stat. 2631, note following 28 U. S. C. §2241.

[14] Both questions are subsumed in the second question in the Solicitor General's brief: "[w]hether, assuming petitioner can assert a claim based on the Geneva Convention, his extradition to France would violate the Convention." Brief in Opposition i.

[15] The Solicitor General's principal ground for opposing certiorari is that the Eleventh Circuit's decision does not conflict with the decision of any other Circuit. See Brief in Opposition 6. That is true but not surprising. The original version of the MCA is only three years old and,

ingly, I would take the case and decide the questions presented in the Solicitor General's brief.[16]

---

as the Solicitor General is careful to note, Noriega is "the only person *currently* detained by the United States as a prisoner of war." *Ibid.* (emphasis added). Accordingly, the lack of a circuit split on the question whether MCA §5(a) bars POWs in federal custody in the United States from invoking the Geneva Conventions in habeas proceedings does not negate the compelling reasons to grant review. Indeed, the Court has taken cases in this area without the benefit of any opinion from a court of appeals, see *Ex parte Quirin, supra,* and in splitless cases involving rare facts and ongoing diplomatic negotiations, see *Kiyemba I, ante,* p. \_\_\_. The Court has also granted review of separation-of-powers and other important legal questions on records far less developed than that here, see, *e.g., Robertson* v. *United States ex rel. Watson, ante,* p. \_\_\_; *Christian Legal Soc. Chapter of Univ. of Cal. Hasting College of Law* v. *Martinez, ante,* p. \_\_\_; on petitions that have required us to reformulate the questions presented, see, *e.g., Robertson, supra; Reed Elsevier, Inc.* v. *Muchnick,* 555 U. S. \_\_\_ (2009); and even on petitions we initially denied, see *Boumediene* v. *Bush,* 551 U. S. 1160 (2007). The Solicitor General also claims (again based on the fact that Noriega is "currently" the only POW in U. S. custody) that review is not warranted because the Eleventh Circuit's decision is of "limited ongoing significance." *Ibid.* This assertion is not persuasive for the reasons set forth above.

[16] As noted, the Solicitor General's first question presented is whether MCA §5(a) "precludes petitioner from invoking" the Third Geneva Convention "as a source of rights in a habeas corpus proceeding." Brief in Opposition i. Such statutory questions do not automatically, or even typically, require a court to consider the statute's constitutionality. Here, however, Noriega has consistently argued that, if the statute precludes him from invoking the Geneva Conventions in the manner the Solicitor General's question describes and the Eleventh Circuit held, the statute would violate the Suspension Clause. See *supra,* at 6–7. Thus, the Suspension Clause issue may in this case fairly be viewed as implicit in the statutory question presented.



NO PAYMENTS UNTIL DECEMBER* GET YOURS

*Search Site*

# Birmingham cocaine, heroin kingpin sentenced to nearly 23 years in prison

by Associated Press
Tuesday, June 28th 2016

AA

Patrick Dewayne Hall, 37, was sentenced Tuesday to 22 years and 11 months after pleading guilty in January to drug charges including drug-trafficking conspiracy and money laundering. (abc3340.com)



DEFENDANT'S EXHIBIT NO. 2 FOR IDENTIFICATION
DATE:　　　　RPTR:

BIRMINGHAM, Ala. (AP) — Authorities say a federal judge sentenced the leader of one of

Birmingham's largest cocaine and heroin trafficking rings to nearly 23 years in federal prison.

Patrick Dewayne Hall, 37, was sentenced Tuesday to 22 years and 11 months after pleading guilty in January to drug charges including drug-trafficking conspiracy and money laundering.

A federal grand jury in October returned a 72-count indictment charging Hall and 23 others.

ADVERTISING



# United States v. Patrick Dewayne Hall, 16-14921 (11th Cir. 2017)

## Court of Appeals for the Eleventh Circuit

Filed: May 10th, 2017

Precedential Status: Non-Precedential

Citations: None known

Docket Number: 16-14921

Nature of suit: NEW

Download Original ▾

Case: 16-14921     Date Filed: 05/10/2017     Page: 1 of 2

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 16-14921
Non-Argument Calendar

D.C. Docket No. 2:15-cr-00283-LSC-HGD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATRICK DEWAYNE HALL,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Alabama

(May 10, 2017)

Before TJOFLAT, WILLIAM PRYOR and BLACK, Circuit Judges.

PER CURIAM:

W. Scott Brower, appointed counsel for Patrick Hall in this direct criminal

appeal, has moved to withdraw from further representation of the appellant and

Case: 16-14921     Date Filed: 05/10/2017     Page: 2 of 2

filed a brief pursuant to Anders v. California,

(1967). Our

independent review of the entire record reveals that counsel's assessment of the

relative merit of the appeal is correct. Because independent examination of the

entire record reveals no arguable issues of merit, counsel's motion to withdraw is

GRANTED, and Hall's convictions and sentences are AFFIRMED.

<div style="border:1px solid;">

### Laws & Legal Resources.

</div>



# Hendrix v. Hunt

**607 So. 2d 1254 (1992)**

James A. HENDRIX v. Guy HUNT, Governor of the State of Alabama.

1911231.

**Supreme Court of Alabama.**

October 30, 1992.

*1255 Bayless E. Biles of Wilkins, Bankester, Biles & Wynne, Bay Minette, for appellant.

Mark D. Hess, Legal Advisor to Governor Guy Hunt, Montgomery, for appellee.

HORNSBY, Chief Justice.

The plaintiff, James A. Hendrix, appeals from the trial court's order dismissing his petition to compel Governor Guy Hunt to appoint him to the office of supernumerary district attorney. We affirm.

The facts of this case are not in dispute. Hendrix was elected to the office of district attorney of Baldwin County, Alabama (then called "circuit solicitor") in November

1958, and he served in that capacity until January 1981. On January 1, 1981, Governor Fob James appointed Hendrix as a supernumerary district attorney for Baldwin County, Alabama. On April 13, 1983, Hendrix was convicted in a federal court on marijuana conspiracy charges and was sentenced to serve five years in a federal penitentiary. As a result of the conviction, Hendrix was removed from the roll of active supernumerary district attorneys.

Hendrix was released on parole in November 1985, and he completed his sentence in 1988. He then petitioned the State of Alabama Board of Pardons and Paroles for a pardon and restoration of civil and political rights. On April 4, 1988, the board granted Hendrix a pardon and "ordered that all civil and political rights which were forfeited as a result of the conviction be and they are hereby restored." Thereafter, Hendrix petitioned this Court to be reinstated as an attorney authorized to practice law in the courts of Alabama. We granted his petition, effective June 10, 1988.

On May 28, 1991, Hendrix wrote to Governor Hunt, requesting "appointment or reappointment to the office of Supernumerary District Attorney" in Baldwin County, Alabama. The Governor did not respond to Hendrix's letter; therefore, on June 24, 1991, Hendrix filed an action against Governor Hunt in the Circuit Court of Baldwin County, seeking a declaration that, as a result of his pardon, he was eligible to serve as a supernumerary district attorney. Governor Hunt filed a motion to dismiss. Before ruling on the motion, the trial court ordered Governor Hunt to grant or deny Hendrix's request. On October 29, 1991, Governor Hunt denied Hendrix's request. The trial court, then, denied Governor Hunt's motion to dismiss. Governor Hunt filed an answer and a motion for judgment on the pleadings, or in the alternative, for summary judgment. The trial court issued an order containing the following provisions:

"[U]nder the latest ruling of the Alabama Supreme Court on the legal effect of a pardon, ... James A. Hendrix[ ] had all legal impediments and disabilities removed upon the granting of the pardon by the executive branch of government insofar as Section 12-17-213(a) and Section 12-17-214, Code of Alabama of 1975, are concerned. ". . . . "Nothing contained in this order directs the defendant to make the appointment, nor does the court rule on the applicability of any other section of the Alabama Code not embraced within the pleadings or made a part of the record."

On February 10, 1992, Hendrix filed in this Court a petition for the writ of mandamus, seeking to compel Governor Hunt to appoint him as a supernumerary district attorney. We denied his petition, without opinion, on March 11, 1992.

On February 28, 1992, Hendrix filed a petition in the Circuit Court of Baldwin County, Alabama, seeking to compel Governor Hunt to appoint him to the office of supernumerary district attorney. On April 2, 1992, Governor Hunt filed a motion to dismiss this petition. On April 16, 1992, the trial court dismissed Hendrix's petition, pursuant to Ala.Code 1975, § 36-9-2, noting *1256 that "at the time [Hendrix] was convicted of a felony offense in the United States District Court for the Southern District of Alabama, he was holding a public office, supernumerary district attorney." The trial court stated that "[i]n the first action file by [Hendrix], ... the fact that [Hendrix] was holding a public office at the time of his conviction was not properly raised." Hendrix appeals from the trial court's order dismissing his petition.

Although the parties have treated the trial court's order as a dismissal under Ala.R.Civ.P. 12(b)(6), the record reveals that the trial court considered undisputed evidence outside the pleadings; therefore, we deal with the court's order as a summary judgment in favor of Governor Hunt. See Ala.R.Civ.P. 12(b). Because the facts of this case are not in dispute, we need only determine whether Governor Hunt was "entitled to a judgment as a matter of law." Bussey v. John Deere Co., 531 So. 2d 860, 862 (Ala.1988) (citing Chiniche v. Smith, 374 So. 2d 872 (Ala.1979)); Rule 56(c) Ala.R.Civ.P.

Ala.Code 1975, § 12-17-213, prescribes the qualifications for serving as a supernumerary district attorney:

"(a) Any person now serving or having formerly served as a district attorney of a judicial circuit of Alabama, who has served for not less than 18 years, when he has reached the age of 60 years, may elect to become a supernumerary district attorney by filing a written declaration to that effect with the governor...."

Without question, if Hendrix had not been convicted for marijuana conspiracy, he would be qualified to serve as a supernumerary district attorney, and he was, in fact, serving in that capacity until his conviction. Hendrix maintains that his pardon restoring his civil and political rights restored his eligibility to serve as a supernumerary district attorney, pursuant this Court's holding in State ex rel. Sokira

v. Burr, 580 So. 2d 1340 (Ala.1991). In Burr we held that an individual who has been convicted of a felony is not prohibited by Ala.Code 1975, § 36-2-1(a)(3), from holding public office, if he receives a pardon expressly restoring all civil and political rights. Id. at 1345. Section 36-2-1 provides, in part:

"(a) The following persons shall be ineligible to and disqualified from holding office under the authority of this state: ". . . . "(3) Those who shall have been convicted of treason, embezzlement of public funds, malfeasance in office, larceny, bribery or any other crime punishable by imprisonment in the state or federal penitentiary and those who are idiots or insane."

(Emphasis added.)

As we pointed out in Burr, § 36-2-1(a)(3) does "not address how a pardon that expressly restores to an individual his `civil and political rights' affects that individual's ability to hold office." Burr, 580 So. 2d at 1341. Hendrix's case is distinguishable from Burr in this regard, because § 36-9-2 expressly addresses the legal effect of a pardon. Section 36-9-2 states:

"When any person holding any office or place under the authority of this state is convicted by any court of the United States, of this state or of any other state of a felony, his office or place shall be vacated from the time of the conviction. If the judgment is reversed, new trial granted or judgment notwithstanding the verdict is rendered, he shall be restored to office; but, if pardoned, he shall not be restored to office."

(Emphasis added.) Unlike Burr, who was convicted of a felony and was pardoned prior to his election to public office (see Burr, 580 So.2d at 1340-41), Hendrix was convicted of a felony while he was serving as a supernumerary district attorney. For this reason, the trial court held that Hendrix was prevented from holding office by § 36-9-2, not by § 36-2-1(a)(3).

We stated in State ex rel. Moore v. Blake, 225 Ala. 124, 126, 142 So. 418, 419 (1932), that the Legislature has the inherent power to prescribe qualifications for the holding of state offices of trust. In § 36-9-2, the Legislature has determined that an official convicted of a felony while holding a public office shall not be restored *1257 to office, even if he receives a pardon.

Hendrix argues that the trial court erred by dismissing his petition to compel Governor Hunt to appoint him to the office of supernumerary district attorney because, he says, he was not seeking to be "restored to office" within the meaning of § 36-9-2. He asserts that "restoring him to office" would mean giving him back the commission issued him by Governor James. Instead, he has requested that Governor Hunt issue him a new commission, to which, he says, § 36-9-2 would not apply.

We find no merit to Hendrix's argument. Regardless of which governor grants the commission, Hendrix seeks an appointment to the same office he forfeited pursuant to § 36-9-2. Accordingly, we affirm the judgment in favor of Governor Hunt.

AFFIRMED.

MADDOX, HOUSTON, STEAGALL and KENNEDY, JJ., concur.

1958, and he served in that capacity until January 1981. On January 1, 1981, Governor Fob James appointed Hendrix as a supernumerary district attorney for Baldwin County, Alabama. On April 13, 1983, Hendrix was convicted in a federal court on marijuana conspiracy charges and was sentenced to serve five years in a federal penitentiary. As a result of the conviction, Hendrix was removed from the roll of active supernumerary district attorneys.

Hendrix was released on parole in November 1985, and he completed his sentence in 1988. He then petitioned the State of Alabama Board of Pardons and Paroles for a pardon and restoration of civil and political rights. On April 4, 1988, the board granted Hendrix a pardon and "ordered that all civil and political rights which were forfeited as a result of the conviction be and they are hereby restored." Thereafter, Hendrix petitioned this Court to be reinstated as an attorney authorized to practice law in the courts of Alabama. We granted his petition, effective June 10, 1988.

On May 28, 1991, Hendrix wrote to Governor Hunt, requesting "appointment or reappointment to the office of Supernumerary District Attorney" in Baldwin County, Alabama. The Governor did not respond to Hendrix's letter; therefore, on June 24, 1991, Hendrix filed an action against Governor Hunt in the Circuit Court of Baldwin County, seeking a declaration that, as a result of his pardon, he was eligible to serve as a supernumerary district attorney. Governor Hunt filed a motion to dismiss. Before ruling on the motion, the trial court ordered Governor Hunt to grant or deny Hendrix's request. On October 29, 1991, Governor Hunt denied Hendrix's request. The trial court, then, denied Governor Hunt's motion to dismiss. Governor Hunt filed an answer and a motion for judgment on the pleadings, or in the alternative, for summary judgment. The trial court issued an order containing the following provisions:

"[U]nder the latest ruling of the Alabama Supreme Court on the legal effect of a pardon, ... James A. Hendrix[ ] had all legal impediments and disabilities removed upon the granting of the pardon by the executive branch of government insofar as Section 12-17-213(a) and Section 12-17-214, Code of Alabama of 1975, are concerned. ". . . . "Nothing contained in this order directs the defendant to make the appointment, nor does the court rule on the applicability of any other section of the Alabama Code not embraced within the pleadings or made a part of the record."

# SENTENCING LAW AND POLICY

An Affiliate of the Law Professor Blogs Network



DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE:          RPTR:

« "Criminal Law in Crisis" | Main | Might getting more technology and more lawyers (as well as more masks) to prisoners help create a turning point for criminal justice change? »

## May 11, 2020

### The new death penalty: COVID has now killed more US prisoners in weeks than the US death penalty has in over a decade

As reported in prior posts here and here, all scheduled executions in the United States have been postponed in the last two months due in large part to the global pandemic.  But a pause in the carrying out of formal death sentences in the United States has been replaced by a new kind of death penalty as COVID has turned all sorts of other sentences in to functional death sentences.

The UCLA Covid-19 Behind Bars Data Project has been doing a terrific job keeping an updated count, via this spreadsheet, of confirmed COVID deaths of persons serving time in state and federal facilities.  As of midday Monday, May 11, the UCLA accounting had tabulated 341 "Confirmed Deaths (Residents)."  This considerable number is sad and disconcerting on its own terms, but it is even more remarkable given that it amounts to more prisoner deaths than has been produced by carrying out formal death sentences in the United States for the entire period from 2010 to 2020. According to DPIC data, there were a total of 329 executions from the start of 2010 through today.

The Marshall Project has also been doing

**LINKS & RESOURCES**

US Department of Justice

US Sentencing Commission

Administrative Office of the US Courts, Department of Program Services, Defender Services Office

National Association of Sentencing Commissions

State Sentencing Commissions

The Sentencing Guidelines Resource Center

Council on Criminal Justice

Death Penalty Information Center

The Sentencing Project

Families Against Mandatory Minimums

Justice Policy Institute

Justice Strategies

Justice Research and Statistics Association

Right on Crime

Vera Institute of Justice, Center on Sentencing and Corrections

Pew Public Safety Performance Project

Prison Policy Initiative

Collateral Consequences Resource Center

National Inventory of Collateral Consequences of

**Blog feedback & suggestions**

**COVID CJ RESOURCE PAGES**

The Appeal

Collateral Consequences Resource Center

Covid Prison Data

FAMM

Federal Defenders

The Justice Collaborative

The Marshall Project

NACDL

Prison Policy Initiative

UCLA Covid-19 Behind Bars Data Project

Vera Institute

**BLOG OWNER**

Douglas A. Berman

Newton D. Baker-Baker & Hostetler Chair in Law

Moritz College of Law at The Ohio State University

Director, Drug Enforcement and Policy Center

Email Me

Web Profile & Disclosure

OSU Faculty Bibliography

Scholarship on SSRN

C.V.

SSRN Author's Page



MORITZ COLLEGE OF LAW • THE OHIO STATE UNIVERSITY

Search

## MY OTHER BLOGS

Marijuana Law, Policy and Reform

Criminal Law Course @ Moritz College of Law

Law School Innovation

Death Penalty Course @ Moritz College of Law

Legislation Course @ Moritz College of Law

Sentencing Courses @ Moritz College of Law

The Golf Blog

## MY BOOKS & JOURNALS



*Sentencing Law & Policy* (4th ed. Wolters Kluwer 2018)

a great job reporting on COVID cases and deaths in penal facilities nationwide: on April 24 it reported 131 deaths of prisoners, and on May 8 its reported prisoner death count was up to 304. If that rate of growth were to continue for months to come, more persons serving time in state and federal facilities may be killed by COVID than have been executed in the United States in the whole modern era of the US death penalty.

May 11, 2020 at 11:56 AM | Permalink

# Comments

No I am not either I am a parent with a daughter in prison ,the judge and D.A. add to her case ,and I enjoy learning ,reading about what's going on ,I could go and on but want ,thank you for your blog Patricia

Posted by: Patricia Ann Murdock | May 12, 2020 10:40:11 AM

Correct me if (again) wrong, but I wish I could say, after many years seeing it, that I'm shocked -- like for Casablanca's gambling -- that even the great Marshall Project and the herein UCLA project, for my state Mass. includes only "state prison" #'s, which I admit are far-far easier to obtain, but neither obtains nor esp'y highlights that they haven't gotten COUNTY JAILS/HOUSES-OF-CORRECTIONS #'s, which due to MA's very broad lower (district) court jurisdiction over many felonies (w/ sentences up to 2.5 yrs), have always had near 50% of our inmates. For most, maybe all, other states I'll guess the figures "only" omit local "jails" w/ mostly/only pretrial detainees. For better AND worse, and we all hope temporary, right now there's at least some data for inmate (&staff) infections -- not deaths! -- in MA's county Jails/HoC's, the SJC-12926-Special-Masters-Weekly-Reports, the last one showing 5937 inmates, ~ 40% more than the already reported (prison-only) USA's 5th most, 351 per 100k inmates

Conviction

The Crime Report

The Marshall Project

Campaign for the Fair Sentencing of Youth

Top 50 Criminal Law Blogs

## CRIMINAL LAW BLOGS

California Corrections Crisis

Crime and Consequences

Crime in America

Crime in the Suites

CrimLaw

CrimProf Blog

DUI Blog

Federal Criminal Appeals Blog

Grits for Breakfast

Mental Disability Blog

Ninth Circuit Blog

Pardon Power

Right on Crime Blog

Sidebars

Simple Justice

Snitching Blog

Solitary Watch

TalkLeft

The Appeal

White Collar Crime Prof

Wrongful Convictions Blog

## DEATH PENALTY BLOGS

Death Penalty News

StandDown Texas Project

**Table D-11**

## LENGTH OF MANDATORY MINIMUM PENALTIES IN DRUG TRAFFICKING CASES[1]
### Fiscal Year 2019



| DRUG TYPE | TOTAL | No Drug Mandatory Minimum[2] | | Five-Year Drug Mandatory Minimum | | Ten-Year or More Drug Mandatory Minimum[3] | |
|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % |
| **TOTAL** | **19,757** | **6,906** | **35.0** | **4,867** | **24.6** | **7,984** | **40.4** |
| Powder Cocaine | 3,581 | 932 | 26.0 | 1,037 | 29.0 | 1,612 | 45.0 |
| **Crack Cocaine** | **1,565** | 838 | 53.5 | 478 | 30.5 | 249 | 15.9 |
| Heroin | 2,509 | 1,056 | 42.1 | 653 | 26.0 | 800 | 31.9 |
| Marijuana | 1,675 | 1,059 | 63.2 | 516 | 30.8 | 100 | 6.0 |
| Methamphetamine | 8,427 | 1,626 | 19.3 | 1,898 | 22.5 | 4,903 | 58.2 |
| Other | 2,000 | 1,395 | 69.8 | 285 | 14.3 | 320 | 16.0 |

[1] Of the 76,538 cases, in 20,085 the offender was sentenced under USSG Chapter Two, Part D (Drugs). Of these, 19,765 offenders were sentenced under §§2D1.1 (Drug Trafficking), 2D1.2 (Protected Locations), 2D1.5 (Continuing Criminal Enterprise), 2D1.6 (Use of a Communication Facility), 2D1.8 (Rent/Manage Drug Establishment), 2D1.10 (Endangering Human Life While Manufacturing), or 2D1.14 (Narco-Terrorism). Of the remaining cases, eight were excluded because the offender was convicted of a mandatory minimum penalty from one of the following statutes: 21 U.S.C. § 860a or 21 U.S.C. § 865. Descriptions of variables used in this table are provided in Appendix A.

[2] Includes 121 offenders whose drug mandatory minimum penalty was 12 months or less.

[3] Includes 402 offenders whose drug mandatory minimum penalty was greater than ten years.

SOURCE: U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

# Table 27

## SENTENCE LENGTH IN EACH CRIMINAL HISTORY CATEGORY BY TYPE OF CRIME[1]
### Fiscal Year 2019

| | | | | CRIMINAL HISTORY CATEGORY | | | | | | | | | | | | | | | | |
| | TOTAL | | | I | | | II | | | III | | | IV | | | V | | | VI | | |
| TYPE OF CRIME | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N | Mean Mths | Median Mths | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 43 | 18 | 75,809 | 30 | 6 | 34,664 | 31 | 10 | 11,095 | 41 | 18 | 12,280 | 56 | 33 | 7,051 | 71 | 48 | 4,174 | 101 | 78 | 6,545 |
| Administration of Justice | 12 | 8 | 694 | 9 | 6 | 417 | 14 | 8 | 69 | 14 | 12 | 82 | 13 | 12 | 48 | 19 | 20 | 35 | 32 | 30 | 43 |
| Antitrust | 6 | 4 | 20 | 6 | 4 | 19 | -- | -- | 1 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 |
| Arson | 76 | 60 | 68 | 73 | 44 | 34 | 58 | 51 | 10 | 90 | 60 | 10 | 60 | 60 | 5 | -- | -- | 2 | 114 | 72 | 7 |
| Assault | 65 | 36 | 766 | 39 | 20 | 303 | 58 | 33 | 105 | 69 | 42 | 137 | 101 | 71 | 86 | 90 | 63 | 41 | 121 | 100 | 94 |
| Bribery/Corruption | 22 | 12 | 340 | 22 | 12 | 301 | 24 | 16 | 19 | 21 | 18 | 12 | -- | -- | 2 | -- | -- | 1 | 27 | 24 | 5 |
| Burglary/Trespass | 16 | 14 | 63 | 13 | 9 | 29 | 13 | 11 | 9 | 16 | 15 | 7 | 22 | 18 | 9 | 20 | 23 | 4 | 28 | 27 | 5 |
| Child Pornography | 103 | 84 | 1,367 | 90 | 72 | 1,037 | 129 | 120 | 121 | 143 | 120 | 136 | 141 | 120 | 40 | 190 | 180 | 21 | 189 | 162 | 12 |
| Commercialized Vice | 24 | 20 | 90 | 14 | 12 | 44 | 15 | 15 | 8 | 37 | 23 | 18 | 30 | 24 | 11 | 41 | 32 | 4 | 45 | 40 | 5 |
| Drug Possession | 2 | 0 | 485 | 2 | 0 | 350 | 1 | 0 | 42 | 1 | 0 | 47 | 4 | 2 | 19 | 4 | 1 | 8 | 9 | 2 | 19 |
| Drug Trafficking | 76 | 60 | 19,811 | 51 | 36 | 8,931 | 72 | 60 | 2,417 | 83 | 66 | 2,890 | 96 | 84 | 1,767 | 109 | 93 | 1,118 | 130 | 120 | 2,688 |
| Environmental | 4 | 0 | 165 | 3 | 0 | 137 | 6 | 0 | 10 | 6 | 6 | 10 | 10 | 7 | 4 | -- | -- | 2 | -- | -- | 2 |
| Extortion/Racketeering | 32 | 27 | 182 | 21 | 12 | 96 | 27 | 18 | 17 | 40 | 36 | 25 | 38 | 34 | 16 | 67 | 62 | 10 | 56 | 48 | 18 |
| Firearms | 50 | 38 | 8,378 | 22 | 12 | 1,412 | 32 | 27 | 801 | 37 | 30 | 1,681 | 52 | 46 | 1,556 | 63 | 57 | 1,143 | 83 | 63 | 1,785 |
| Food and Drug | 9 | 0 | 48 | 8 | 0 | 43 | 1 | 0 | 4 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 | -- | -- | 1 |
| Forgery/Counter/Copyright | 15 | 12 | 276 | 8 | 6 | 107 | 7 | 8 | 27 | 16 | 12 | 45 | 17 | 18 | 27 | 25 | 27 | 25 | 27 | 26 | 45 |
| Fraud/Theft/Embezzlement | 22 | 12 | 6,212 | 18 | 7 | 4,366 | 23 | 12 | 537 | 26 | 18 | 564 | 34 | 26 | 268 | 35 | 27 | 181 | 40 | 36 | 296 |
| Immigration | 9 | 6 | 29,225 | 4 | 2 | 13,258 | 7 | 6 | 6,163 | 12 | 10 | 5,548 | 20 | 18 | 2,490 | 29 | 24 | 1,080 | 34 | 30 | 686 |
| Individual Rights | 31 | 6 | 64 | 30 | 3 | 59 | 29 | 7 | 4 | -- | -- | 1 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 |
| Kidnapping | 171 | 120 | 96 | 114 | 96 | 33 | 210 | 188 | 11 | 226 | 160 | 12 | 163 | 159 | 10 | 238 | 180 | 7 | 187 | 120 | 23 |
| Manslaughter | 70 | 60 | 74 | 50 | 36 | 29 | 92 | 72 | 12 | 71 | 59 | 22 | 70 | 61 | 4 | -- | -- | 2 | 109 | 110 | 5 |
| Money Laundering | 61 | 33 | 1,174 | 47 | 24 | 861 | 77 | 60 | 116 | 82 | 57 | 94 | 128 | 100 | 44 | 108 | 92 | 17 | 162 | 159 | 42 |
| Murder | 255 | 240 | 373 | 242 | 240 | 143 | 230 | 204 | 33 | 236 | 235 | 55 | 285 | 276 | 52 | 279 | 240 | 27 | 278 | 276 | 63 |
| National Defense | 43 | 24 | 188 | 25 | 18 | 155 | 47 | 48 | 8 | 38 | 51 | 3 | -- | -- | 0 | -- | -- | 0 | 179 | 180 | 21 |
| Obscenity/Other Sex Offenses | 20 | 18 | 389 | 18 | 12 | 43 | 15 | 12 | 57 | 16 | 15 | 94 | 20 | 21 | 84 | 24 | 24 | 49 | 27 | 30 | 62 |
| Prison Offenses | 11 | 8 | 621 | 6 | 1 | 29 | 10 | 2 | 11 | 6 | 4 | 165 | 11 | 8 | 128 | 13 | 12 | 118 | 15 | 15 | 170 |
| Robbery | 109 | 92 | 1,825 | 83 | 60 | 459 | 95 | 84 | 221 | 100 | 84 | 344 | 112 | 92 | 257 | 118 | 96 | 188 | 151 | 139 | 356 |
| Sexual Abuse | 205 | 180 | 1,165 | 201 | 180 | 750 | 165 | 120 | 129 | 194 | 180 | 115 | 218 | 188 | 59 | 287 | 296 | 64 | 272 | 263 | 48 |
| Stalking/Harassing | 29 | 24 | 222 | 22 | 15 | 103 | 22 | 18 | 27 | 32 | 30 | 36 | 42 | 37 | 30 | 37 | 38 | 8 | 47 | 44 | 18 |
| Tax | 16 | 12 | 547 | 13 | 8 | 444 | 26 | 17 | 38 | 27 | 21 | 41 | 29 | 26 | 8 | 41 | 41 | 8 | 35 | 39 | 8 |
| Other | 3 | 0 | 881 | 2 | 0 | 672 | 6 | 2 | 68 | 8 | 0 | 86 | 6 | 4 | 26 | 6 | 1 | 11 | 13 | 6 | 18 |

[1] Of the 76,538 cases, 729 cases were excluded due to missing Criminal History Category. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. The information in this table includes conditions of confinement as described in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

# Table 15

## SENTENCE IMPOSED BY TYPE OF CRIME[1]
### Fiscal Year 2019

| TYPE OF CRIME | SENTENCE LENGTH[2] | | | LENGTH OF IMPRISONMENT[3] | | |
|---|---|---|---|---|---|---|
| | Mean Months | Median Months | N | Mean Months | Median Months | N |
| TOTAL | 42 | 18 | 76,538 | 46 | 21 | 70,231 |
| Administration of Justice | 12 | 8 | 698 | 16 | 12 | 504 |
| Antitrust | 6 | 4 | 20 | 6 | 4 | 17 |
| Arson | 76 | 60 | 68 | 78 | 60 | 66 |
| Assault | 64 | 36 | 787 | 73 | 41 | 687 |
| Bribery/Corruption | 22 | 12 | 341 | 29 | 18 | 250 |
| Burglary/Trespass | 16 | 14 | 64 | 17 | 15 | 56 |
| Child Pornography | 103 | 84 | 1,368 | 103 | 84 | 1,354 |
| Commercialized Vice | 24 | 20 | 90 | 28 | 21 | 75 |
| Drug Possession | 2 | 0 | 563 | 4 | 3 | 297 |
| Drug Trafficking | 76 | 60 | 19,830 | 79 | 60 | 19,099 |
| Environmental | 3 | 0 | 179 | 8 | 2 | 47 |
| Extortion/Racketeering | 32 | 27 | 185 | 38 | 33 | 151 |
| Firearms | 50 | 39 | 8,481 | 53 | 41 | 7,994 |
| Food and Drug | 9 | 0 | 48 | 32 | 24 | 13 |
| Forgery/Counter/Copyright | 15 | 12 | 276 | 18 | 14 | 212 |
| Fraud/Theft/Embezzlement | 21 | 12 | 6,390 | 28 | 21 | 4,738 |
| Immigration | 9 | 6 | 29,354 | 10 | 6 | 27,991 |
| Individual Rights | 29 | 3 | 68 | 52 | 27 | 37 |
| Kidnapping | 171 | 120 | 96 | 170 | 120 | 96 |
| Manslaughter | 70 | 60 | 74 | 73 | 63 | 71 |
| Money Laundering | 61 | 33 | 1,177 | 68 | 42 | 1,040 |
| Murder | 255 | 240 | 373 | 255 | 240 | 372 |
| National Defense | 42 | 24 | 195 | 48 | 27 | 170 |
| Obscenity/Other Sex Offenses | 20 | 18 | 393 | 21 | 18 | 374 |
| Prison Offenses | 11 | 8 | 628 | 11 | 8 | 607 |
| Robbery | 109 | 92 | 1,825 | 110 | 93 | 1,800 |
| Sexual Abuse | 205 | 180 | 1,165 | 206 | 180 | 1,158 |
| Stalking/Harassing | 29 | 24 | 223 | 31 | 24 | 204 |
| Tax | 16 | 12 | 547 | 23 | 18 | 351 |
| Other | 3 | 0 | 1,032 | 7 | 1 | 400 |

[1] Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. Descriptions of variables used in this table are provided in Appendix A.

[2] Sentences of probation only are included here as zero months of imprisonment. In addition, the information presented in this column includes conditions of confinement as described in USSG §5C1.1.

[3] Length of imprisonment does not include probation or any conditions of confinement as described in USSG §5C1.1.

SOURCE: U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

# Table 30

## SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE
## IN EACH CIRCUIT AND DISTRICT[1]
### Fiscal Year 2019

| CIRCUIT / District | TOTAL | WITHIN GUIDELINE RANGE | | DEPARTURE | | | | | | DOWNWARD | | VARIANCE | |
| | | N | % | UPWARD | | §5K1.1 | | §5K3.1 | | N | % | N | % |
| | | | | N | % | N | % | N | % | | | | |
| TOTAL | 76,034 | 39,078 | 51.4 | 364 | 0.5 | 7,272 | 9.6 | 7,119 | 9.4 | 3,162 | 4.2 | 19,039 | 25.0 |
| | | | | | | | | | | | | | |
| **D.C. CIRCUIT** | 330 | 139 | 42.1 | 3 | 0.9 | 32 | 9.7 | 2 | 0.6 | 35 | 10.6 | 119 | 36.1 |
| District of Columbia | 330 | 139 | 42.1 | 3 | 0.9 | 32 | 9.7 | 2 | 0.6 | 35 | 10.6 | 119 | 36.1 |
| | | | | | | | | | | | | | |
| **FIRST CIRCUIT** | 2,134 | 1,042 | 48.8 | 15 | 0.7 | 172 | 8.1 | 1 | 0.0 | 85 | 4.0 | 819 | 38.4 |
| Maine | 162 | 58 | 35.8 | 2 | 1.2 | 25 | 15.4 | 0 | 0.0 | 6 | 3.7 | 71 | 43.8 |
| Massachusetts | 476 | 177 | 37.2 | 7 | 1.5 | 46 | 9.7 | 1 | 0.2 | 26 | 5.5 | 219 | 46.0 |
| New Hampshire | 196 | 72 | 36.7 | 0 | 0.0 | 29 | 14.8 | 0 | 0.0 | 7 | 3.6 | 88 | 44.9 |
| Puerto Rico | 1,165 | 708 | 60.8 | 6 | 0.5 | 59 | 5.1 | 0 | 0.0 | 46 | 3.9 | 346 | 29.7 |
| Rhode Island | 135 | 27 | 20.0 | 0 | 0.0 | 13 | 9.6 | 0 | 0.0 | 0 | 0.0 | 95 | 70.4 |
| | | | | | | | | | | | | | |
| **SECOND CIRCUIT** | 3,549 | 1,119 | 31.5 | 10 | 0.3 | 627 | 17.7 | 9 | 0.3 | 150 | 4.2 | 1,634 | 46.0 |
| Connecticut | 349 | 120 | 34.4 | 3 | 0.9 | 51 | 14.6 | 0 | 0.0 | 46 | 13.2 | 129 | 37.0 |
| New York | | | | | | | | | | | | | |
|   Eastern | 622 | 166 | 26.7 | 2 | 0.3 | 114 | 18.3 | 0 | 0.0 | 60 | 9.6 | 280 | 45.0 |
|   Northern | 381 | 216 | 56.7 | 2 | 0.5 | 56 | 14.7 | 1 | 0.3 | 8 | 2.1 | 98 | 25.7 |
|   Southern | 1,514 | 377 | 24.9 | 0 | 0.0 | 241 | 15.9 | 8 | 0.5 | 28 | 1.8 | 860 | 56.8 |
|   Western | 518 | 204 | 39.4 | 2 | 0.4 | 142 | 27.4 | 0 | 0.0 | 7 | 1.4 | 163 | 31.5 |
| Vermont | 165 | 36 | 21.8 | 1 | 0.6 | 23 | 13.9 | 0 | 0.0 | 1 | 0.6 | 104 | 63.0 |
| | | | | | | | | | | | | | |
| **THIRD CIRCUIT** | 2,336 | 1,019 | 43.6 | 11 | 0.5 | 432 | 18.5 | 19 | 0.8 | 61 | 2.6 | 794 | 34.0 |
| Delaware | 122 | 53 | 43.4 | 4 | 3.3 | 11 | 9.0 | 12 | 9.8 | 3 | 2.5 | 39 | 32.0 |
| New Jersey | 615 | 261 | 42.4 | 0 | 0.0 | 107 | 17.4 | 0 | 0.0 | 8 | 1.3 | 239 | 38.9 |
| Pennsylvania | | | | | | | | | | | | | |
|   Eastern | 627 | 248 | 39.6 | 2 | 0.3 | 163 | 26.0 | 2 | 0.3 | 31 | 4.9 | 181 | 28.9 |
|   Middle | 505 | 257 | 50.9 | 1 | 0.2 | 97 | 19.2 | 5 | 1.0 | 15 | 3.0 | 130 | 25.7 |
|   Western | 382 | 150 | 39.3 | 3 | 0.8 | 49 | 12.8 | 0 | 0.0 | 3 | 0.8 | 177 | 46.3 |
| Virgin Islands | 85 | 50 | 58.8 | 1 | 1.2 | 5 | 5.9 | 0 | 0.0 | 1 | 1.2 | 28 | 32.9 |
| | | | | | | | | | | | | | |
| **FOURTH CIRCUIT** | 5,691 | 3,209 | 56.4 | 47 | 0.8 | 700 | 12.3 | 3 | 0.1 | 176 | 3.1 | 1,556 | 27.3 |
| Maryland | 759 | 263 | 34.7 | 8 | 1.1 | 137 | 18.1 | 0 | 0.0 | 52 | 6.9 | 299 | 39.4 |
| North Carolina | | | | | | | | | | | | | |
|   Eastern | 822 | 501 | 60.9 | 14 | 1.7 | 161 | 19.6 | 1 | 0.1 | 10 | 1.2 | 135 | 16.4 |
|   Middle | 490 | 267 | 54.5 | 5 | 1.0 | 59 | 12.0 | 0 | 0.0 | 6 | 1.2 | 153 | 31.2 |
|   Western | 538 | 317 | 58.9 | 2 | 0.4 | 102 | 19.0 | 0 | 0.0 | 6 | 1.1 | 111 | 20.6 |
| South Carolina | 1,049 | 587 | 56.0 | 8 | 0.8 | 128 | 12.2 | 0 | 0.0 | 38 | 3.6 | 288 | 27.5 |
| Virginia | | | | | | | | | | | | | |
|   Eastern | 1,200 | 782 | 65.2 | 7 | 0.6 | 54 | 4.5 | 0 | 0.0 | 41 | 3.4 | 316 | 26.3 |
|   Western | 241 | 124 | 51.5 | 1 | 0.4 | 27 | 11.2 | 2 | 0.8 | 14 | 5.8 | 73 | 30.3 |
| West Virginia | | | | | | | | | | | | | |
|   Northern | 280 | 182 | 65.0 | 0 | 0.0 | 26 | 9.3 | 0 | 0.0 | 4 | 1.4 | 68 | 24.3 |
|   Southern | 312 | 186 | 59.6 | 2 | 0.6 | 6 | 1.9 | 0 | 0.0 | 5 | 1.6 | 113 | 36.2 |

**Table 30 (cont.)**

| CIRCUIT District | TOTAL | WITHIN GUIDELINE RANGE N | % | DEPARTURE UPWARD N | % | §5K1.1 N | % | §5K3.1 N | % | DOWNWARD N | % | VARIANCE N | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FIFTH CIRCUIT** | **21,294** | 14,911 | 70.0 | 125 | 0.6 | 1,124 | 5.3 | 716 | 3.4 | 1,208 | 5.7 | 3,210 | 15.1 |
| Louisiana | | | | | | | | | | | | | |
| Eastern | **288** | 169 | 58.7 | 2 | 0.7 | 44 | 15.3 | 0 | 0.0 | 6 | 2.1 | 67 | 23.3 |
| Middle | **182** | 95 | 52.2 | 2 | 1.1 | 40 | 22.0 | 1 | 0.5 | 1 | 0.5 | 43 | 23.6 |
| Western | **372** | 266 | 71.5 | 4 | 1.1 | 36 | 9.7 | 0 | 0.0 | 3 | 0.8 | 63 | 16.9 |
| Mississippi | | | | | | | | | | | | | |
| Northern | **185** | 69 | 37.3 | 1 | 0.5 | 50 | 27.0 | 0 | 0.0 | 4 | 2.2 | 61 | 33.0 |
| Southern | **453** | 330 | 72.8 | 2 | 0.4 | 46 | 10.2 | 8 | 1.8 | 3 | 0.7 | 64 | 14.1 |
| Texas | | | | | | | | | | | | | |
| Eastern | **724** | 517 | 71.4 | 3 | 0.4 | 24 | 3.3 | 1 | 0.1 | 10 | 1.4 | 169 | 23.3 |
| Northern | **1,556** | 971 | 62.4 | 16 | 1.0 | 184 | 11.8 | 0 | 0.0 | 31 | 2.0 | 354 | 22.8 |
| Southern | **7,809** | 4,587 | 58.7 | 88 | 1.1 | 422 | 5.4 | 489 | 6.3 | 897 | 11.5 | 1,326 | 17.0 |
| Western | **9,725** | 7,907 | 81.3 | 7 | 0.1 | 278 | 2.9 | 217 | 2.2 | 253 | 2.6 | 1,063 | 10.9 |
| | | | | | | | | | | | | | |
| **SIXTH CIRCUIT** | **5,297** | 2,444 | 46.1 | 13 | 0.2 | 1,055 | 19.9 | 10 | 0.2 | 198 | 3.7 | 1,577 | 29.8 |
| Kentucky | | | | | | | | | | | | | |
| Eastern | **557** | 318 | 57.1 | 0 | 0.0 | 91 | 16.3 | 0 | 0.0 | 9 | 1.6 | 139 | 25.0 |
| Western | **348** | 161 | 46.3 | 3 | 0.9 | 87 | 25.0 | 2 | 0.6 | 12 | 3.4 | 83 | 23.9 |
| Michigan | | | | | | | | | | | | | |
| Eastern | **879** | 376 | 42.8 | 1 | 0.1 | 116 | 13.2 | 1 | 0.1 | 26 | 3.0 | 359 | 40.8 |
| Western | **392** | 201 | 51.3 | 2 | 0.5 | 68 | 17.3 | 0 | 0.0 | 4 | 1.0 | 117 | 29.8 |
| Ohio | | | | | | | | | | | | | |
| Northern | **900** | 447 | 49.7 | 4 | 0.4 | 190 | 21.1 | 0 | 0.0 | 24 | 2.7 | 235 | 26.1 |
| Southern | **561** | 164 | 29.2 | 1 | 0.2 | 133 | 23.7 | 5 | 0.9 | 89 | 15.9 | 169 | 30.1 |
| Tennessee | | | | | | | | | | | | | |
| Eastern | **743** | 388 | 52.2 | 2 | 0.3 | 210 | 28.3 | 0 | 0.0 | 14 | 1.9 | 129 | 17.4 |
| Middle | **315** | 89 | 28.3 | 0 | 0.0 | 71 | 22.5 | 0 | 0.0 | 15 | 4.8 | 140 | 44.4 |
| Western | **602** | 300 | 49.8 | 0 | 0.0 | 89 | 14.8 | 2 | 0.3 | 5 | 0.8 | 206 | 34.2 |
| | | | | | | | | | | | | | |
| **SEVENTH CIRCUIT** | **2,448** | 899 | 36.7 | 5 | 0.2 | 243 | 9.9 | 2 | 0.1 | 127 | 5.2 | 1,172 | 47.9 |
| Illinois | | | | | | | | | | | | | |
| Central | **225** | 81 | 36.0 | 0 | 0.0 | 32 | 14.2 | 0 | 0.0 | 7 | 3.1 | 105 | 46.7 |
| Northern | **655** | 192 | 29.3 | 2 | 0.3 | 46 | 7.0 | 2 | 0.3 | 50 | 7.6 | 363 | 55.4 |
| Southern | **285** | 146 | 51.2 | 2 | 0.7 | 35 | 12.3 | 0 | 0.0 | 2 | 0.7 | 100 | 35.1 |
| Indiana | | | | | | | | | | | | | |
| Northern | **356** | 148 | 41.6 | 0 | 0.0 | 44 | 12.4 | 0 | 0.0 | 19 | 5.3 | 145 | 40.7 |
| Southern | **472** | 219 | 46.4 | 0 | 0.0 | 51 | 10.8 | 0 | 0.0 | 5 | 1.1 | 197 | 41.7 |
| Wisconsin | | | | | | | | | | | | | |
| Eastern | **267** | 41 | 15.4 | 0 | 0.0 | 29 | 10.9 | 0 | 0.0 | 2 | 0.7 | 195 | 73.0 |
| Western | **188** | 72 | 38.3 | 1 | 0.5 | 6 | 3.2 | 0 | 0.0 | 42 | 22.3 | 67 | 35.6 |
| | | | | | | | | | | | | | |
| **EIGHTH CIRCUIT** | **5,423** | 2,437 | 44.9 | 35 | 0.6 | 674 | 12.4 | 73 | 1.3 | 116 | 2.1 | 2,088 | 38.5 |
| Arkansas | | | | | | | | | | | | | |
| Eastern | **552** | 334 | 60.5 | 3 | 0.5 | 42 | 7.6 | 0 | 0.0 | 12 | 2.2 | 161 | 29.2 |
| Western | **258** | 128 | 49.6 | 0 | 0.0 | 39 | 15.1 | 2 | 0.8 | 3 | 1.2 | 86 | 33.3 |
| Iowa | | | | | | | | | | | | | |
| Northern | **415** | 217 | 52.3 | 11 | 2.7 | 89 | 21.4 | 0 | 0.0 | 6 | 1.4 | 92 | 22.2 |
| Southern | **493** | 196 | 39.8 | 1 | 0.2 | 73 | 14.8 | 0 | 0.0 | 5 | 1.0 | 218 | 44.2 |
| Minnesota | **380** | 116 | 30.5 | 2 | 0.5 | 71 | 18.7 | 2 | 0.5 | 17 | 4.5 | 172 | 45.3 |
| Missouri | | | | | | | | | | | | | |
| Eastern | **1,190** | 465 | 39.1 | 4 | 0.3 | 87 | 7.3 | 0 | 0.0 | 9 | 0.8 | 625 | 52.5 |
| Western | **772** | 297 | 38.5 | 2 | 0.3 | 115 | 14.9 | 0 | 0.0 | 29 | 3.8 | 329 | 42.6 |
| Nebraska | **527** | 266 | 50.5 | 1 | 0.2 | 18 | 3.4 | 57 | 10.8 | 5 | 0.9 | 180 | 34.2 |
| North Dakota | **328** | 100 | 30.5 | 0 | 0.0 | 130 | 39.6 | 10 | 3.0 | 4 | 1.2 | 84 | 25.6 |
| South Dakota | **508** | 318 | 62.6 | 11 | 2.2 | 10 | 2.0 | 2 | 0.4 | 26 | 5.1 | 141 | 27.8 |

**Table 30 (cont.)**

| CIRCUIT District | TOTAL | WITHIN GUIDELINE RANGE | | DEPARTURE UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| **NINTH CIRCUIT** | **14,689** | **4,552** | **31.0** | **53** | **0.4** | **1,098** | **7.5** | **5,358** | **36.5** | **581** | **4.0** | **3,047** | **20.7** |
| Alaska | **193** | 56 | 29.0 | 2 | 1.0 | 25 | 13.0 | 0 | 0.0 | 4 | 2.1 | 106 | 54.9 |
| Arizona | **5,529** | 1,951 | 35.3 | 33 | 0.6 | 130 | 2.4 | 2,735 | 49.5 | 88 | 1.6 | 592 | 10.7 |
| California | | | | | | | | | | | | | |
| Central | **1,138** | 386 | 33.9 | 1 | 0.1 | 147 | 12.9 | 94 | 8.3 | 87 | 7.6 | 423 | 37.2 |
| Eastern | **510** | 228 | 44.7 | 1 | 0.2 | 80 | 15.7 | 21 | 4.1 | 17 | 3.3 | 163 | 32.0 |
| Northern | **483** | 146 | 30.2 | 0 | 0.0 | 60 | 12.4 | 9 | 1.9 | 15 | 3.1 | 253 | 52.4 |
| Southern | **4,087** | 746 | 18.3 | 8 | 0.2 | 235 | 5.7 | 2,426 | 59.4 | 295 | 7.2 | 377 | 9.2 |
| Guam | **49** | 30 | 61.2 | 0 | 0.0 | 12 | 24.5 | 0 | 0.0 | 2 | 4.1 | 5 | 10.2 |
| Hawaii | **154** | 59 | 38.3 | 0 | 0.0 | 36 | 23.4 | 0 | 0.0 | 1 | 0.6 | 58 | 37.7 |
| Idaho | **372** | 151 | 40.6 | 1 | 0.3 | 82 | 22.0 | 24 | 6.5 | 19 | 5.1 | 95 | 25.5 |
| Montana | **384** | 139 | 36.2 | 2 | 0.5 | 99 | 25.8 | 1 | 0.3 | 4 | 1.0 | 139 | 36.2 |
| Nevada | **482** | 190 | 39.4 | 2 | 0.4 | 39 | 8.1 | 2 | 0.4 | 14 | 2.9 | 235 | 48.8 |
| Northern Mariana Islands | **11** | 8 | 72.7 | 0 | 0.0 | 1 | 9.1 | 0 | 0.0 | 0 | 0.0 | 2 | 18.2 |
| Oregon | **473** | 118 | 24.9 | 2 | 0.4 | 70 | 14.8 | 0 | 0.0 | 25 | 5.3 | 258 | 54.5 |
| Washington | | | | | | | | | | | | | |
| Eastern | **358** | 153 | 42.7 | 0 | 0.0 | 64 | 17.9 | 14 | 3.9 | 4 | 1.1 | 123 | 34.4 |
| Western | **466** | 191 | 41.0 | 1 | 0.2 | 18 | 3.9 | 32 | 6.9 | 6 | 1.3 | 218 | 46.8 |
| | | | | | | | | | | | | | |
| **TENTH CIRCUIT** | **6,478** | **3,731** | **57.6** | **35** | **0.5** | **368** | **5.7** | **895** | **13.8** | **355** | **5.5** | **1,094** | **16.9** |
| Colorado | **523** | 186 | 35.6 | 1 | 0.2 | 99 | 18.9 | 76 | 14.5 | 13 | 2.5 | 148 | 28.3 |
| Kansas | **451** | 192 | 42.6 | 5 | 1.1 | 84 | 18.6 | 2 | 0.4 | 5 | 1.1 | 163 | 36.1 |
| New Mexico | **3,948** | 2,736 | 69.3 | 7 | 0.2 | 56 | 1.4 | 690 | 17.5 | 183 | 4.6 | 276 | 7.0 |
| Oklahoma | | | | | | | | | | | | | |
| Eastern | **100** | 60 | 60.0 | 1 | 1.0 | 18 | 18.0 | 0 | 0.0 | 0 | 0.0 | 21 | 21.0 |
| Northern | **215** | 88 | 40.9 | 10 | 4.7 | 30 | 14.0 | 0 | 0.0 | 34 | 15.8 | 53 | 24.7 |
| Western | **407** | 227 | 55.8 | 0 | 0.0 | 24 | 5.9 | 4 | 1.0 | 3 | 0.7 | 149 | 36.6 |
| Utah | **656** | 187 | 28.5 | 9 | 1.4 | 39 | 5.9 | 110 | 16.8 | 101 | 15.4 | 210 | 32.0 |
| Wyoming | **178** | 55 | 30.9 | 2 | 1.1 | 18 | 10.1 | 13 | 7.3 | 16 | 9.0 | 74 | 41.6 |
| | | | | | | | | | | | | | |
| **ELEVENTH CIRCUIT** | **6,365** | **3,576** | **56.2** | **12** | **0.2** | **747** | **11.7** | **31** | **0.5** | **70** | **1.1** | **1,929** | **30.3** |
| Alabama | | | | | | | | | | | | | |
| Middle | **260** | 145 | 55.8 | 0 | 0.0 | 43 | 16.5 | 2 | 0.8 | 5 | 1.9 | 65 | 25.0 |
| Northern | **542** | 317 | 58.5 | 2 | 0.4 | 100 | 18.5 | 1 | 0.2 | 5 | 0.9 | 117 | 21.6 |
| Southern | **376** | 267 | 71.0 | 0 | 0.0 | 42 | 11.2 | 2 | 0.5 | 3 | 0.8 | 62 | 16.5 |
| Florida | | | | | | | | | | | | | |
| Middle | **1,594** | 772 | 48.4 | 4 | 0.3 | 265 | 16.6 | 20 | 1.3 | 15 | 0.9 | 518 | 32.5 |
| Northern | **302** | 144 | 47.7 | 2 | 0.7 | 54 | 17.9 | 6 | 2.0 | 3 | 1.0 | 93 | 30.8 |
| Southern | **1,903** | 1,128 | 59.3 | 1 | 0.1 | 106 | 5.6 | 0 | 0.0 | 14 | 0.7 | 654 | 34.4 |
| Georgia | | | | | | | | | | | | | |
| Middle | **407** | 280 | 68.8 | 1 | 0.2 | 39 | 9.6 | 0 | 0.0 | 7 | 1.7 | 80 | 19.7 |
| Northern | **507** | 176 | 34.7 | 2 | 0.4 | 30 | 5.9 | 0 | 0.0 | 17 | 3.4 | 282 | 55.6 |
| Southern | **474** | 347 | 73.2 | 0 | 0.0 | 68 | 14.3 | 0 | 0.0 | 1 | 0.2 | 58 | 12.2 |

[1] Of the 76,538 cases, 504 were excluded because information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2019 Datafile, USSCFY19.